UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEVIN SANDERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:22 C 50064 |
| | ) |
| MCHENRY VILLA, LLC, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Kevin Sanderson owned and operated an in-home care business, Access Everywhere Home Senior Care ("Access Everywhere"), which provided non-medical services to elderly and homebound individuals. Until 2021, Access Everywhere rented office space in an independent living facility owned by Defendant McHenry Villa, LLC ("McHenry Villa"). The office space provided Access Everywhere with convenient access to clients who lived in Defendant's facility. But on April 15, 2021, Defendant terminated Plaintiff's lease. In this lawsuit, Plaintiff alleges that the termination resulted in a significant loss of business. He charges Defendant with tortious interference with contract, tortious interference with prospective business advantage, and false light invasion of privacy. Defendant seeks summary judgment on each of these claims and, for the reasons explained here, the motion [98] is granted.[1]

### BACKGROUND

Plaintiff Kevin Sanderson started his in-home care business, Access Everywhere Home Senior Care, in 2015. (Pl. Dep., Ex 5 to Pl. Resp. to Def. Mot. for Summ. J. [106] (hereinafter "Pl.

---

[1] The court's jurisdiction is secure. Plaintiff Sanderson is a citizen of Canada and a lawful resident of the United States. Defendant McHenry Villa, LLC is a limited liability company with a singular member, Sergei Shvetzoff, a citizen and resident of Minnesota. Plaintiff has plausibly alleged that at least $75,000 is at stake. McHenry Villa was sold to a third party some time after the events in this suit, and its new owner is not a party. (Def. Mot. for Summ. J. [98] at 3.)

First Dep.") at 23:10–20.) He employed caregivers who would work on site in elderly individuals' homes, helping them with daily tasks including meal preparation, laundry, cleaning, bathing, transportation to and from appointments, and reminders to take medication. (*Id.* at 25:20–24, 26:1–7.) Defendant McHenry Villa was an independent living facility for seniors and provided housing, meals, and housekeeping to its tenants. (Def. Mot. for Summ. J. [98] at 3–4.)

Early in 2019, Plaintiff sought to expand his business. Beginning on May 1, 2019, he leased office space within the McHenry Villa facility. (*Id.* at 3; Pl. First Dep. at 65:1–19.) The commercial lease agreement that the parties entered into authorized either party to terminate the lease "at any time, with or without cause," by giving the other party thirty days' written notice. (Commercial Lease ¶ 2, Ex. F to Def. Mot. for Summ. J. [98-6].) After signing the lease, Plaintiff began meeting with residents and securing contracts with individual tenants or their powers of attorney for caregiving services. (Amended Compl. [4] ¶ 8; Pl. First Dep. at 111:9–12.) Defendant was not a party to Plaintiff's contracts with its tenants, and Plaintiff provided care to clients at McHenry Villa with his own staff, twenty-four hours per day, seven days per week. (Def. Mot. for Summ. J. at 4; Pl Dep., Ex. 2 to Pl. Resp. to Def. Mot. for Summ. J. [106] (hereinafter "Pl. Second Dep.") at 21:8–17.) Plaintiff himself or the clients' family members would verbally inform Defendant of which residents had contracts with Plaintiff, enabling Defendant to contact Plaintiff's staff when one of Plaintiff's clients needed assistance. (Pl. Second Dep. at 78:1–24, 79:1–7; Young Dep., Ex. I to Def. Mot. for Summ. J. [98-9] at 46:6–13.) When any resident pulled the help cord located in each apartment for assistance, it triggered an alert to a call board at the Defendant's reception desk. (Young Dep. at 45:20–25, 46:1–24.). The call board was color-coded by care provider, and Plaintiff's clients were identified by a blue dot that alerted the receptionist to contact Plaintiff's caregiver by walkie-talkie when Plaintiff's clients pulled their cords. (*Id.*)

In March 2021, Defendant's Executive Director, Amanda Young, and its Regional Director of Operations, Stefan Stamenkovic, made the decision not to renew Plaintiff's monthly lease; they

2

testified they had received complaints from residents about lack of care, and conflicts regarding COVID protocols. (Young Dep. at 32:5–33:5.)[2] Pursuant to the Commercial Lease Agreement, Defendant sent a letter to Plaintiff on March 15, 2021, notifying Plaintiff that the Access Everywhere lease would terminate in thirty days on April 15, 2021. (Letter to Pl., Ex. G to Def. Mot. for Summ. J. [98-7].) That same day, Defendant communicated with McHenry Villa residents by letter, notifying them McHenry Villa would be partnering with a new care provider called Home Instead, but that were free to "choose to stay with [their] current home care provider." (Letter to Residents, Ex. H to Def. Mot. for Summ. J. [98-8].) The letter further explained that Access Everywhere would "no longer be located on-site at McHenry Villa" and that Home Instead would occupy the office space there and offer services to residents beginning April 16, 2021.

At the time Plaintiff received the notice terminating his lease, he was running his business from home and did not need the McHenry Villa office space but planned to continue providing care to his clients at McHenry Villa twenty-four hours per day. (Pl. First Dep. at 114:17–24; 115:1–16; Pl. Second Dep. at 82:10–19.) Each of Plaintiff's twelve clients at McHenry Villa switched to different care providers, however, ending their contracts with Plaintiff.[3] (Amended Compl. ¶ 6.) Plaintiff alleges that Defendant intentionally interfered with Plaintiff's third-party contracts with his clients at McHenry Villa and also interfered with Plaintiff's prospective business advantage. (*Id.*) Plaintiff further alleges the letter to residents implied Plaintiff would no longer be available to provide services to his clients at McHenry Villa, portraying Plaintiff in a false light and thereby invading his privacy. (Pl. Resp. to Def. Mot. for Summ. J. (hereinafter "Pl. Resp.") [105] at 9–11.)

---

[2] *See* Moran Dep., Ex. J to Def. Mot. for Summ. J. [98-10] at 13:3–25, 14:1–24; Stamenkovic Dep., Ex. K to Def. Mot. for Summ. J. [98-11] at 15:9–25, 16:1–12, 19:5–17, 21:12–19, 35:1–5. *See also* Pl. First Dep. at 75:19–24, 76:1–5.

[3] Plaintiff sued these former clients in Small Claims court, but all suits were dismissed. (Pl. First Dep. at 128:15–24, 129:1–3; Def. Mot. to Dismiss [21] at 1 n.1.)

3

**DISCUSSION**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "On a motion for summary judgment, the district court must construe all facts and draw all reasonable inferences in favor of the non-movant." *Srail v. Village of Lisle,* 588 F.3d 940, 948 (7th Cir. 2009). Once a motion for summary judgment has been properly supported, the opposing party has the burden of setting forth specific facts which present a genuine issue of fact for trial. *Shlay v. Montgomery,* 802 F.2d 918, 920 (7th Cir. 1986). Thus, the opposing party must produce affirmative evidence raising a genuine issue for trial and may not merely rest upon allegations in the pleadings. *Anderson,* 477 U.S. at 256–57 (1986). This court's jurisdiction over this action is based on diversity under 28 U.S.C. § 1332, and Illinois law is controlling in this matter.

**I. Tortious Interference with Contracts**

Plaintiff alleges that Defendant intentionally and unjustifiably interfered with his home care contracts with individual residents at McHenry Villa in two ways: by sharing Plaintiff's employee list with a competitor and by inducing residents to breach their contracts. (Amended Compl. ¶¶ 10–11; Pl. Resp. at 4.) Under Illinois law, a plaintiff has the burden of proving the following elements to establish tortious interference with a contract: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach. *Echo, Inc. v. Timberland Machines & Irr., Inc.,* 661 F.3d 959, 968 (7th Cir. 2011) (citations omitted).

It is undisputed that Plaintiff had some form of contractual relationships with some residents at McHenry Villa, and that Defendant was not a party to those relationships. (Pl. Resp. at 3; Young Dep. at 42:22–25, 43: 1–8, 45:10–15.)[4] It is also undisputed that Defendant had a general knowledge of which tenants had service contracts with Plaintiff, as indicated by the color-coded call board which enabled communication between Defendant's receptionists and Plaintiff's caregivers when Plaintiff's clients pulled the cords in their apartments for assistance. (Pl. Resp. at 4; Young Dep. at 45:20–25, 46:1–24.). But Plaintiff has offered no non-speculative evidence that Defendant induced a breach of any contracts with residents.

First, there is no evidence that any residents breached contractual obligations to Plaintiff. In his response to Defendant's motion, the only evidence of a predicate breach of contract that Sanderson points to is his own deposition testimony, in which he stated that he had sued his former clients from McHenry Villa for breach of contract in small claims court. (See Pl. Resp. at 5-6 (quoting First Dep. at 128:15-16)). But as Sanderson himself explained in his deposition, "those lawsuits were dropped." (First Dep. at 129:3.) The mere fact that Sanderson sued former clients is not evidence that those clients breached the terms of whatever agreement they had with him.

Nor is there evidence sufficient to support a finding that, as Plaintiff urges, Defendant tortiously interfered by sharing a list of his employees with Defendant's new home care service tenant, Home Instead. (Pl. Resp. at 4.) Plaintiff relies on two affidavits for this argument, but neither supports the assertion that Defendant engaged in the alleged conduct. (*Id.*) The affidavits, from two McHenry Villa residents who were clients of Plaintiff, say simply that the residents "began receiving services from Home Instead's employees who had been [their] health care workers as

---

[4] Defendant disputes the validity of one such contract with Elaine Summerhill, whose Power of Attorney attested that Summerhill did not have the mental capacity to sign such a contract. (Pike Aff. ¶ 5, Ex. A to Def. Reply to Pl. Resp. [108].) But both parties acknowledge the existence of contracts between Plaintiff and several residents of Defendant. (Young Dep. at 42:22–25, 43:1–8; 50:18–25.)

Sanderson's employees." (*Id.* at 4-5.) Nothing about these statements supports an inference that Defendant passed Plaintiff's employees' information on to Home Instead, nor that Defendant possessed his employees' contact information at all: Amanda Young, Defendant's Executive Director, testified that Defendant never had a list of Plaintiff's caregivers' names or contact information and could not have shared this information with Home Instead. (Young Dep. 52:22-24.). Notably, Plaintiff himself testified that McHenry Villa receptionists communicated with Plaintiff's staff via walkie-talkies, not phones. (Pl. Second Dep. 20:19-24; 21:1-7; 22:9-17; 23:6-9; 26:1-21.). Further, he acknowledged that "caregivers have a tendency to come and go," meaning that a high turnover rate is standard in his business. (Pl. Second Dep. 19:21-24.) That caregivers once employed by Sanderson now work for Home Instead simply does not implicate Defendant.

Plaintiff next claims that the court can infer that Defendant shared Plaintiff's client list with Home Instead from the fact that after April 16, 2021, all twelve of Plaintiff's McHenry Villa clients sought care from Home Instead rather than Access Everywhere. (Pl. Resp. 5.). True, Defendant notified all residents of Plaintiff's lease termination, as well as the new lease agreement with Home Instead, in a letter from Amanda Young on March 15, 2021, and notified residents that the Home Instead team would contact them. (Letter to Residents, Ex. H to Def. Mot. for Summ. J.) But this, too, does not constitute evidence that Defendant shared Plaintiff's client list with Home Instead, and it is quite plausible that Plaintiff's clients sought to change providers without any interference or persuasion from a third party.[5]

Finally, Plaintiff alleges that Amanda Young "personally interfered with [Plaintiff's] operations" by recommending other care providers to some of Defendant's tenants. (Pl. Resp.

---

[5] Three representatives of Defendant (Young, Moran, and Stamenkovic) testified they had received or heard of complaints from Plaintiff's clients and clients' family members about Plaintiff's services. (Young Dep. 15:6-19; 32:9-14; 62:15-20; Moran Dep. 13:10-25; 14:6-14; Stamenkovic Dep. 15:9-19; 20:1-6.).

5.) Plaintiff offers only his own testimony as proof of this allegation. (Pl. Resp. at 5.) In the same referenced testimony, however, Plaintiff acknowledged that he was not the only home care provider operating at McHenry Villa and did not have an exclusive arrangement with Defendant. (*Id.*).[6] There is no admissible evidence that Young referred tenants to other providers, and if she did identify other available home care services, she was conveying truthful information to Defendant's own residents; "supplying truthful information [does] not qualify as an unjustified act." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 384 (7th Cir. 2003). Plaintiff has not set forth specific facts showing Defendant intentionally and unjustifiably induced a breach of Plaintiff's contracts.

## II. Tortious Interference with Prospective Business Advantage

Plaintiff next alleges Defendant intentionally and unjustifiably interfered with Plaintiff's business by inducing his employees to terminate their employment and by no longer treating Plaintiff as the "agency of choice" at McHenry Villa. (Amended Compl. ¶ 20; Pl. Resp. at 9.) To prove the elements of tortious interference with prospective business advantage under Illinois law, a plaintiff must establish that (1) the plaintiff had a reasonable expectation of entering into a valid business relationship; (2) the defendant had knowledge of the plaintiff's expectancy; (3) the defendant purposefully or intentionally interfered with the plaintiff's legitimate expectancy, preventing it from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003) (citation omitted).

---

[6] Notably, Plaintiff has not established that tenants to whom Young allegedly referred other providers were Plaintiff's clients in the first place. At the time of the relevant events, McHenry Villa had some eighty residents, and Plaintiff had contracts with approximately twelve residents. (Pl. Compl. ¶ 8; Young Dep. 50:18-22.) That means the overwhelming majority of McHenry Villa's residents either had contracts with other care providers or none at all and may well have asked Young for a referral.

7

Initially, the court notes confusion about which business relationship(s) plaintiff reasonably expected to enter into. In his Amended Complaint, Plaintiff asserted he "had a reasonable expectancy of business relationships with future residents of McHenry Villa." (Pl. Compl. ¶ 18.) But in response to Defendant's Motion for Summary Judgment, Plaintiff states that he had a reasonable expectancy of a business relationship with McHenry Villa itself under his lease agreement. (Pl. Resp. at 6.) This new theory is a non-starter: Plaintiff entered into a month-to-month lease agreement with Defendant on May 1, 2019. (Commercial Lease, Ex. F to Def. Mot. for Summ. J.) The lease provided that either party could terminate the lease "at any time[,] with or without cause," with thirty days' written notice to the other party. (*Id.* ¶ 2.) As Illinois courts recognize, "[i]t is not reasonable . . . to expect the existence of a current renewable service contract to serve as a guarantee that the agreement would continue indefinitely." *CD Consortium Corp. v. Saint John Cap. Corp.*, 2021 IL App (1st) 201159-U, ¶ 19.[7] Similar to a renewable contract, the month-to-month lease in this case granted both parties equal flexibility and uncertainty, and as such, does not support a finding of reasonable expectation of continuity in Plaintiff's business relationship with Defendant.

Nor has Plaintiff established that he had a reasonable expectation of business relationships with future residents at McHenry Villa. (Amended Compl. ¶ 18.) Plaintiff contends his business was the "agency of choice" at McHenry Villa, meaning (in his view) that Plaintiff was to receive all referrals from Defendant's representatives. (Pl. Resp. at 6.) Plaintiff admitted in his deposition testimony that such a designation was not stated in any contract or agreement. (*Id.*) Instead, he believes that "agency of choice" status could be inferred from lease provisions that required him to "man the place 24 hours a day." (Pl. First Dep. 121:18–24, 122:1–24, 123:5–19.) Any such inference is defeated, however, by Plaintiff's own testimony that Defendant's corporate agent, Vicki Grant, told Plaintiff he did not have exclusive referral rights. Instead, she told him in

---

[7] Moreover, Plaintiff testified he did not like the office he leased from Defendant and that he did not need the office to run his business. (Pl. First Dep. at 114:17–24, 115:1–4.)

8

a September 21, 2019 email, "I am not sure where the agency of choice came from exactly, but certainly we want you to be successful.'" (*Id.* at 41:5–42:7.) She also advised that "Our job at McHenry is not to be referring exclusively to anyone." (*Id.* at 42:8–11.) Plaintiff claims he told McHenry Villa personnel that he "would need some assurances that [he]'d get all the leads," but has no record of this, nor any confirmation that he received such assurances. (*Id.* at 42:20–44:1.)

Plaintiff offered inconsistent testimony about the presence of other home care providers at McHenry Villa during the time when he leased office space there, at one point stating that "there were no other home health service agencies available in that area" and at another point pointing out that "there was other people doing services in there," including "two Polish ladies." (Pl. Second Dep. at 54:15–24; Pl. First Dep. 115:20–24, 116:1–5.) Amanda Young testified that there were several other home care providers working for McHenry Villa residents:

> Q. While Access was providing home care services at McHenry, were they --were there any other home care providers at McHenry, or was he the sole provider?
>
> A.· We had many different agencies in the building that came and went. Some were [VA], some were live-in caregivers. We had a single person who came in and out of the building that had been there long before Health Dimensions Group was the management company or they owned the building. We had psych (verbatim) home health. There were many different agencies that came into the building.
> . . . .
>
> We had caregivers . . . from FirstLight, who was the agency before Kevin, still coming in the building. We had VA-contracted state caregivers coming in. There were -- was a live-in, Barb. There was another live-in that was a family member that helped some of the other Margaret came in and out of the building. We-- there was a few other agencies in the area that -- names, I couldn't tell you off the top of my head. This has been quite a few years now.

(Young Dep. at 43:11–25, 44:16–25.) In short, while Plaintiff may have wanted to believe he was exclusively receiving all referrals, making him the "agency of choice," Defendant's agents plainly told him that no such agreement existed. Plaintiff himself knew that a new care provider was moving into Defendant's space after his lease ended, and he expected that new provider to attract clients. (Pl. First Dep. at 124:5–17.) Any expectation that he would exclusively receive all referrals would not be reasonable.

9

Finally, even if Plaintiff had a reasonable expectation that he would continue to reap as many referrals as he had before his lease ended, he offers no evidence that Defendant intentionally interfered with those expectations. (Pl. Resp. 9.) His allegation that Defendant "induc[ed] his employees to terminate their employment with Plaintiff," is unsupported by any testimony or documents. (Amended Compl. ¶ 20.). Plaintiff's assertion that Defendant tortiously interfered with Plaintiff's business "by sending letters to Plaintiff's customers to give the appearance that Plaintiff was no longer in business" is similarly unsupported. (*Id.*) As described above, Defendant did send a letter to its residents on March 15, 2021, informing them that Plaintiff's business would "no longer be located on-site at McHenry Villa," and the "Home Instead team will move into the vacated office space"—but the letter also assured residents that any of them were free to "choose to stay with [his or her] current home care provider." Three of Defendant's former employees testified they did not encourage any resident to switch from Plaintiff's business to Home Instead. (Young Dep. at 47:22–24, 51:16–18; Moran Dep. at 37:1–21; Stemankovic Dep. at 25:18–21). Plaintiff's response rests on nothing more than a request that the court draw an inference in his favor from the loss of what *he* deems a reasonable expectancy of prospective business advantage. (Pl. Resp. at 9.) This court declines to do so.

**III.     False Light Invasion of Privacy**

That leaves Plaintiff's claim that Defendant's March 15, 2021 letter to residents created the false impression that Plaintiff's business, Access Everywhere, could no longer serve its clients' needs. (Amended Compl. ¶ 25; Pl. Resp. at 10.) To prove a claim for false-light invasion of privacy, a plaintiff must allege that (1) the plaintiff was put in a false light before the public as a result of the defendant's actions; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with knowledge that the statement was false or with reckless disregard for whether the statement was true or false. *Green v. Trinity Int'l Univ.,* 344 Ill. App. 3d 1079, 1090, 801 N.E.2d 1208, 1217–18 (2nd Dist. 2003).

Plaintiff argues that McHenry residents satisfy the definition of "the public" because the "public disclosure requirement may be satisfied by proof that the plaintiff has a special relationship with the 'public' to whom the information is disclosed." (Pl. Resp. at 10 (citing *Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976, 981, 560 N.E.2d 900, 903 (1st Dist.1990).)  While the discussion in *Miller* pertained to an action for public disclosure of private facts, courts have adopted that definition of "public" for a false-light action as well.  *See Poulos v. Lutheran Soc. Servs. of Illinois, Inc.,* 312 Ill. App. 3d 731, 739–40, 728 N.E.2d 547, 555–56 (1st Dist. 2000).

The court can assume this element of the claim is met, as it is undisputed that Plaintiff had a special relationship with his McHenry clients.  The issue is whether Plaintiff established that Defendant disclosed "false and highly offensive information" to those with whom Plaintiff had that special relationship.  *Id.* at 740.  The letter Defendant sent to its residents on March 15, 2021, stated that, "Effective April 16, Access Everywhere Senior Home Care *will no longer be located on-site* at McHenry Villa." (Letter to Residents, Ex. H to Def. Mot. for Summ. J. (emphasis added.))  As Plaintiff acknowledges, this statement was true.  As in *Green*, Plaintiff asserts this cause of action arises from what the letter did *not* say.  (Pl. Resp. at 10.)  Specifically, Plaintiff opines that "[n]owhere in this letter does it state that [Plaintiff's business] and its caregivers could and would continue to provide the services that they had done in the past – the implication is that they cannot."  (*Id.*)

Defendant's letter did in fact inform residents that they "may choose to stay with [their] current home care provider."  (Letter to Residents, Ex. H to Def. Mot. for Summ. J.)  This included Plaintiff's business, as Plaintiff stated it held contracts for home care services with twelve of Defendant's residents.  Defendant could of course have mentioned Access Everywhere specifically when assuring residents they could choose to stay with their current home care provider, but Defendant was by no means obligated to do so.  The letter provided residents with information concerning a change in the leased space in the building in which they lived.  Nothing about this was false or defamatory.

11

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [98] is granted. The Clerk is directed to enter judgment in favor of Defendant.

Dated: June 26, 2025

_____
REBECCA R. PALLMEYER
United States District Judge